# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

OSCAR RAY BOLIN, JR.,

       Petitioner,

v.                        CASE NO. 8:15-cv-**2943** T27 MAP

JULIE L. JONES, SECRETARY,
FLORIDA DEPARTMENT
OF CORRECTIONS,

       Respondent.

_____/


## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PRISONER IN STATE CUSTODY
## UNDER A SENTENCE OF DEATH


### _EMERGENCY STAY SOUGHT_
### _EXECUTION SCHEDULED: JANUARY 7, 2016_

J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
Florida Bar No. 0019181
615 Turner Street
Clearwater, FL 33756
Email: jervis@acquitter.com
Phone: (727) 446-7505
Fax:     (727) 446-8147
COUNSEL FOR APPLICANT

BJORN E. BRUNVAND, ESQ.
BRUNVAND WISE, P.A.
Florida Bar No. 0831077
615 Turner Street
Clearwater, FL 33756
Email: bjorn@acquitter.com
Phone: (727) 446-7505
Fax:     (727) 446-8147
COUNSEL FOR APPLICANT

# TABLE OF CONTENTS

I.   THE PARTIES..................................................................................... 1

III. PROCEDURAL HISTORY ................................................................ 3

IV. PRELIMINARY STATEMENT REGARDING 28 U.S.C. § 2244(b).............. 7

V.  GROUNDS FOR RELIEF ................................................................ 10

VI. CLAIMS FOR RELIEF .................................................................. 10

CLAIM I.   THE STATE SUPPRESSED EXCULPATORY EVIDENCE, IN VIOLATION OF THE
SIXTH AND FOURTEENTH AMENDMENTS. ............................................... 11

CLAIM II.   PETITIONER IS ENTITLED TO RAISE AND SHOULD BE GRANTED RELIEF ON
A FREESTANDING ACTUAL INNOCENCE CLAIM ON FEDERAL HABEAS REVIEW.......... 36

VII.  PRAYER FOR RELIEF ............................................................... 40

OSCAR RAY BOLIN, JR., through counsel, petitions for a Writ of Habeas Corpus,[1] and in support thereof submits the following:

## I.   THE PARTIES

1. Petitioner OSCAR RAY BOLIN, JR. is incarcerated in the Florida State Prison under a sentence of death.  He is scheduled to be executed by the State of Florida on January 7, 2016.

2. Respondent JULIE L. JONES is the Secretary of the Florida Department of Corrections and, in that capacity, has responsibility for Petitioner's custody and for carrying out the execution warrant.

## II.   A STAY SHOULD BE GRANTED[2]

3. Petitioner respectfully requests a stay of his January 7, 2016 execution date pending the disposition of this petition.

---

[1] As explained in more detail in Section IV, *supra*, Petitioner has filed this petition, which is based on newly discovered evidence of innocence and *Brady* violations, without first obtaining leave from the Eleventh Circuit pursuant to 28 U.S.C. § 2244(b).  The reason is Petitioner's belief that his first petition—which was dismissed as time-barred due to prior counsel's ineffectiveness in failing to comply with the statute of limitations—did not count as a "first" petition for purposes § 2244(b) in light of *McQuiggan v. Perkins*, 133 S. Ct. 1924 (2013).  Nevertheless, in an abundance of caution, Petitioner has filed simultaneously with this petition a § 2244(b) application in the Eleventh Circuit for leave to file a "second" petition. Petitioner has informed the Eleventh Circuit of the simultaneously filings.  To the extent that this Court and the Eleventh Circuit need time beyond January 7, 2016 to determine whether leave to file this petition is necessary under *McQuiggan*, Petitioner respectfully requests a stay of execution pending that determination.

[2] Petitioner has filed a separate motion for a stay of execution.

4. This Court considers four factors when determining whether a stay of execution is appropriate under 28 U.S.C. § 2251: "Whether the movant has made a showing of likelihood of success on the merits and of irreparable injury if the stay is not granted, whether the stay would substantially harm other parties, and whether granting the stay would serve the public interest." *Bundy v. Wainwright*, 808 F.2d 1410, 1421 (11th Cir. 1987).

5. Petitioner has satisfied the requirements for a stay of execution. First, for the reasons set forth below in Section VI, *infra*, Petitioner has established a likelihood of success on the merits. Second, Petitioner will clearly suffer irreparable injury—death—if a stay is not granted. *See Bundy*, 808 F.2d. at 1177 ("We consider the irreparability of the injury that petitioner will suffer in the absence of a stay to be self-evident."). Third, no substantial harm will flow to the State of Florida or its citizens by postponing Petitioner's execution to determine whether he is actually innocent and/or deprived of a fair trial, particularly given that he has been on death row already for nearly two decades. *See id.* ("We perceive no substantial harm that will flow to the State of Alabama or its citizens from postponing petitioner's execution"). Finally, granting a stay would clearly serve the public interest by ensuring that an innocent man is not put to death.

## III.   PROCEDURAL HISTORY

6. In 1992, Petitioner was convicted in a Florida court of the murder of Teri Lynn Mathews.  The trial court sentenced him to death.   On direct appeal, the Florida Supreme Court overturned Petitioner's conviction, concluding that improper evidence had been admitted at his trial.  *Bolin v. State*, 650 So. 2d 19, 21 (Fla. 1995).

7. The State retried Petitioner, and he was again convicted and sentenced to death.  The Florida Supreme Court again overturned the conviction, ruling that the trial court had abused its discretion during jury selection.  *Bolin v. State*, 736 So. 2d 1160, 1166-67 (Fla. 1999).

8. In 2001, Petitioner was convicted and sentenced to death for a third time. The Florida Supreme Court affirmed.  *Bolin v. State*, 869 So. 2d 1196 (Fla. 2004). The United States Supreme Court denied certiorari.  *Bolin v. Florida*, 543 U.S. 882 (2004).

9. In 2005, Petitioner moved for state post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.851, arguing, among other things, that he had received constitutionally ineffective assistance of trial counsel.  *Bolin v. State*, 41 So. 3d 151, 154-55 (Fla. 2010).   Upon the State's objection, the state court dismissed Petitioner's motion without prejudice because his attorney, Robert Norgard, had failed to include a legally sufficient oath.

3

10.   In 2006, Petitioner's counsel re-filed the Rule 3.851 motion with the required oath.  Following an evidentiary hearing, the state court denied relief. *Id.* at 154.  The Florida Supreme Court affirmed. *Id.* at 155-60.

11.   In 2010, Petitioner, through counsel Norgard, filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254 in this Court, raising his ineffective assistance of trial counsel claim.  8:10-cv-1571 (M.D. Fla.), Doc. 1.  In 2013, this Court dismissed the petition as time-barred because it was not filed within the one-year limitations period set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *Id.*, Doc. 31.  The Court found that, although Petitioner's original Rule 3.851 motion was filed one day before the expiration of the AEDPA limitations period, it had no tolling effect under § 2244(d)(2) because the lack of the required oath meant that it was not "properly filed."  Because Petitioner re-filed the Rule 3.851 motion after the AEDPA limitations period had already expired, the Court ruled, statutory tolling was inapplicable, and the § 2254 petition was untimely.  The U.S. Court of Appeals for the Eleventh Circuit denied a certificate of appealability ("COA"). *Bolin v. Sec., Fla. Dept. of Corrections*, No. 13-13539-P (11th Cir. 2013).

12.   In 2014, Petitioner, represented by new counsel, moved in his § 2254 proceeding for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b), arguing that Norgard's ineffectiveness caused had his petition to be

untimely. 8:10-cv-1571 (M.D. Fla.), Doc. 37. The Court denied the motion. *Id.*, Doc. 39. Petitioner did not seek a COA from the Eleventh Circuit.

13. Petitioner subsequently filed a successive motion for Rule 3.851 post-conviction relief in state court based on two issues of newly discovered evidence of innocence and two related violations of *Brady v. Maryland*, 373 U.S. 83 (1965), arising from the State's failure to disclose its prior knowledge of the evidence. The state post-conviction court held an evidentiary hearing on two of those claims and summarily denied the other two. Just after the state court issued its final order and before the time for seeking rehearing had even expired, the Governor of Florida signed a death warrant. The state circuit court went on the deny rehearing and all other relief.

14. The Florida Supreme Court issued an expedited death warrant briefing schedule for Petitioner's appeal of the post-conviction court's ruling. Petitioner urged the Florida Supreme Court to grant a stay of execution and permit oral argument, pointing to the post-conviction court's failure to apply binding precedent holding that newly discovered evidence and *Brady* claims must be evaluated in the context of all admissible evidence that has been uncovered over the entire history of the case, including all of the evidence that was presented at the original trial, and all evidence uncovered during post-conviction proceedings, including any evidence that was previously excluded as procedurally barred, as well as any evidence

underlying previously-presented *Brady* claims. *See Swafford v. State*, 125 So. 3d 760 (Fla. 2013); *Hildwin v. State*, 141 So. 3d 1178 (Fla. 2014); *see also Kyles v. Whitley*, 514 U.S. 419, 422 (1995). Petitioner pointed to the fact that such a comprehensive review was not conducted by the post-conviction court, and emphasized that it could not fairly be conducted in the first instance by the Florida Supreme Court in just three weeks before his scheduled execution. The Florida Supreme Court denied a stay, denied oral argument, and affirmed, wholly ignoring Petitioner's scope-of-review argument in its decision. *Bolin v. State*, No. SC15-2419 (Fla. Dec. 17, 2015).

15. Petitioner now timely petitions this Court for relief pursuant to 28 U.S.C. § 2254. After uncovering his newly discovered evidence of actual innocence and the corresponding *Brady* violations in 2014, Petitioner filed a motion for post-conviction relief in state court, tolling the AEDPA limitations period. *See* 28 U.S.C. § 2244(d)(2).

16. Petitioner acknowledges that he has previously petitioned this Court for § 2254 relief. He has therefore sought permission in the Eleventh Circuit to file this petition, in accordance with the standards outlined in 28 U.S.C. § 2244(b) and 11th Cir. R. 22-3. Petitioner's § 2244(b) application in pending in the Eleventh Circuit.

6

17.   Nevertheless, for the reasons discussed in Part III, *infra*, even if the Eleventh Circuit denies Petitioner's pending § 2244(b) application, this Court should consider this petition as Petitioner's first request for relief under § 2254 for purposes of AEDPA's limitation on second or successive petitions.   Accordingly, the Court should reach this petition on the merits, and grant Petitioner's motion for a stay of execution until his claims are finally adjudicated.

## IV.   PRELIMINARY STATEMENT REGARDING 28 U.S.C. § 2244(b)

18.   The present § 2254 petition should be considered Petitioner's first for purposes of AEDPA's limitation on second or successive petitions.   Accordingly, the gatekeeping requirement in § 2244(b) should not apply, and the present petition should proceed on the merits.

19.   Petitioner's initial § 2254 proceeding was dismissed as time-barred. Although the dismissal of a § 2254 petition on AEDPA limitations grounds ordinarily constitutes a decision on the merits for purposes of the successive rules in § 2244(b), the Supreme Court's decision in *McQuiggan v. Perkins*, 133 S. Ct. 1924 (2013), alters that landscape in cases like Petitioner's.

20.   The Supreme Court's decision in *McQuiggan* arose from its recognition in *Schlup v. Delo* of an exception to procedural default where a petitioner who claims actual innocence in conjunction with a constitutional violation may have his constitutional claims heard by passing through an "innocence gateway."   513 U.S.

298, 315 (1995); *see also House v. Bell*, 547 U.S. 518 (2006) (observing that, in certain exceptional cases involving a compelling claim of actual innocence, the state procedural default rule is not a bar to a federal habeas corpus petition). The Court clarified that assertion of actual innocence is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Schlup*, 513 U.S. at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). "To be credible," the Court explained, "such a claim of innocence requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Id.* at 324.

21. In *McQuiggan*, the Court held that the actual innocence gateway opens not only where the impediment is a procedural bar, but also where the impediment is the expiration of the statute of limitations. 133 S. Ct. at 1928. Thus, in cases where the petitioner has made a compelling showing of his actual innocence under the *Schlup* gateway standard, an exception to AEDPA's limitation period exists and the underlying constitutional claims may be considered on the merits notwithstanding the petitioner's untimely filing.

22. The essential principle of *McQuiggan* is applicable in Petitioner's case. Petitioner, because of his former counsel's blunder, failed to meet AEDPA's one-

8

year deadline and his first habeas petition was rejected as time-barred.[3] Now, he has compelling newly discovered evidence of actual innocence and *Brady* violations that he wishes to press in federal court. However, the failure to meet the AEDPA deadline in his first § 2254 habeas proceeding is blocking him from filing another habeas petition without obtaining leave of this Court through the onerous § 2244(b) requirements. Thus, under *McQuiggan*, the missed limitations deadline should not impede Petitioner from filing his actual innocence claims in federal court.

23. Neither the Supreme Court nor the Eleventh Circuit have yet addressed the interplay of *McQuiggan* and § 2244(b). Petitioner maintains that a proper reading of *McQuiggan* shows that he does not need permission from the Eleventh Circuit under § 2244(b) in order to file the present § 2254 petition. Accordingly, Petitioner filed this § 2254 petition directly in this Court.

24. Nevertheless, due to the uncertainty in the law and in an abundance of caution, Petitioner has simultaneously filed a § 2244(b) application in the Eleventh Circuit, which is pending. Petitioner asserts that this Court does not need to await the Eleventh Circuit's ruling on the application, and therefore he respectfully requests a stay of his impending execution and a merits ruling on his claims.

---

[3] In an unrelated case, the Eleventh Circuit recently recognized Norgard's ineffectiveness with respect to a missed AEDPA limitations deadline in a Florida capital case. *See Stewart v. Sec'y, Fla. Dep't of Corr.*, No. 14-11238 (11th Cir. Dec. 22, 2015).

9

However, if the Court is not prepared to address the *McQuiggan* issue at this juncture, Petitioner respectfully requests an order staying his impending execution to permit the Eleventh Circuit and this Court time to address the uncertainty in the law. Petitioner's counsel is prepared to submit further briefing on this matter at the Court's request.

## V.    GROUNDS FOR RELIEF

25.  Petitioner's death sentence was obtained in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.  To the extent that the Florida courts adjudicated Petitioner's federal constitutional claims on the merits, those decisions were: (1) contrary to and/or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States; and/or (2) based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).

26.  An evidentiary hearing is appropriate, and Petitioner submits that any adverse state court findings can be overcome by clear and convincing evidence. *See id.* §§ 2254(e)(1)-(2).

## VI.   CLAIMS FOR RELIEF

27.  Petitioner's claims, along with supporting facts and legal arguments, are set forth below.   Petitioner respectfully requests leave to file a separate

memorandum of law addressing in more detail the legal and procedural issues relevant to each claim.

28. Petitioner's claims are properly exhausted because their legal bases and factual foundations were fully presented to the state courts. *See Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 457 (11th Cir. 2015).

29. To the extent that Respondent asserts in her answer that specific claims are procedurally defaulted, such allegations are waivable affirmative defenses. *See Moon v. Head*, 285 F.3d 1301, 1315 n.17 (11th Cir. 2002). Accordingly, Petitioner will respond to such defenses if and when they are raised.

### CLAIM I.   THE STATE SUPPRESSED EXCULPATORY EVIDENCE, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS.

30. All other facts, allegations, and claims set forth in this petition, its attachments, and the other submissions made in this litigation are incorporated as if fully set forth herein. This claim was presented to the state court in Petitioner's most recent Rule 3.851 proceeding.

31. It is axiomatic that due process requires the prosecution to disclose all evidence favorable to the defense, whether it is exculpatory or valuable for impeachment. *Banks v. Dretke*, 540 U.S. 668 (2004). This Court's duty to enforce *Brady* "with painstaking care is never more exacting than it is in a capital case." *Kyles v. Whitley*, 514 U.S. 419, 422 (1995). The disclosure duty is not limited to information actually known to the prosecutor, but rather includes all information in

the possession of the prosecutor's office, police, and others acting on behalf of the prosecution. *Kyles*, 514 U.S. at 437, 482.

32.   The Eleventh Circuit has identified three components of a successful *Brady* claim: "[1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 664, 661 (11th Cir. 2014). *Brady*'s prejudice prong, also referred to as the "materiality prong," is met where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Kyles*, 514 U.S. at 433. Although prejudice is initially analyzed claim-by-claim, this Court is required to "then weigh the cumulative impact of all the suppressed evidence." *Wright v. Fla. Dep't of Corr.*, 761 F.3d 1256, 1278 (11th Cir. 2014) (citing *Kyles*, 514 U.S. at 436).

### A. The State Failed to Disclose that Steven Kasler Confessed to the Murder for Which Petitioner was Convicted and Sentenced to Death

33.   In March 2014, an Ohio Department of Corrections inmate named Stephen Crane, contacted Mr. Bolin's wife and informed her that another Ohio inmate by the name of Steven Kasler had confessed to committing the murder of Teri Matthews. Kasler, moreover, was serving sentences in Ohio for two other murder convictions, as well as for several other violent offenses.

12

34. The following month, Kasler himself contacted Mr. Bolin's wife. On September 19, 2014, a prearranged legal call was conducted with Steven Kasler. Kasler confessed to having committed the murder of Teri Matthews and provided details of the offense. Kasler confirmed that he would testify to having committed the Teri Matthews homicide. Kasler further stated that he would testify that Mr. Bolin had nothing to do with the homicide.

35. Bolin went on to assert in a state post-conviction motion that Kasler's confession to the Matthews homicide was newly discovered evidence that was of such nature that it would probably produce an acquittal on retrial and which weakened the State's case against Mr. Bolin to such an extent that it gives rise to a reasonable doubt as to Mr. Bolin's culpability. On November 13, 2014, the circuit court conducted a case management conference on the motion. At the conclusion of the hearing, the court scheduled an evidentiary hearing to be held on December 10, 2014 as to the Kasler issue. Shortly after the case management conference, the parties learned that Kasler had just recently committed suicide.

36. In light of Kasler's death, the state circuit court cancelled the evidentiary hearing and struck the Kasler claim, but granted with leave to amend the claim. Mr. Bolin, thereafter amended his claim of the newly discovered evidence of Kasler's confession to establish that the Kasler confession could be

13

admitted as a statement against penal interest through inmate Stephen Crane and counsel Bjorn Brunvand, both of whom Kasler had confessed to.

37.   At that same time during the wake of Kasler's suicide, the State provided Mr. Bolin with various correspondence that it had received in late 2013 from Stephen Crane in which references were made to Kasler's confession to having committed the instant offense.  Mr. Bolin thereby also went on amend his motion to include a *Brady* claim regarding the failure to timely disclose the Crane-Kasler letters to the defense.

38.   The state circuit court conducted an evidentiary hearing on the two Kasler-related grounds for relief on August 24, 2015.  At the hearing, counsel Bjorn Brunvand testified as set forth above that, in September, 2014, Kasler confessed to having committed the murder of Ms. Matthews.  Kasler stated, consistent with the facts of the case, that he abducted Ms. Matthews from her vehicle at a post office in Land O'Lakes.  He further stated, consistent with the facts of the case, that he had left her car running and left her purse behind.  Kasler went on to state that he was willing to testify in the instant case and would confess to having murdered Teri Matthews.   That same day, counsel also had a conversation with Stephen Crane, who corroborated Kasler's confession as having been consistent with confessions Kasler made to him.

39. In emails that Kasler sent to counsel through an Ohio DOC email system, Kasler further discussed having committed the murder with an individual named Albert Eugene Holmes, who went by the name of Petey. Kasler discussed that he and Petey abducted the victim in a pick-up truck, Petey had sex with her, and that he, Kasler, then stabbed and beat her to death. In that email, he further described that he and Petey trolled around the St. Joseph's Hospital looking for nurses after having killed the victim. He further stated that they had wrapped Ms. Matthew's body in a sheet from that hospital at some point.

40. Aside from the murders for which he was serving sentences, Kasler had also confessed to two other murders that were committed under circumstances very similar to those of the instant case. Those murders were also committed relatively close in time to the instant homicide. In one such case, involving victim Theresa Butler, Kasler confessed to having abducted the victim, a young woman, from her car on the side of the road. An arrest warrant had been issued for Kasler in connection with that homicide, and remained in effect until his death. In the other similar case, involving another young adult female victim Pamela Mitchell, Kasler confessed to having abducted the victim from a Krystal Burger and later murdering her.

41. In his conversations with counsel, Kasler further stated that he has never had any contact with Mr. Bolin or his wife and that neither of them had anything to

do with his decision to come forward and confess to the murder. The State presented no evidence to rebut that assertion.

42. Following Mr. Brunvand's testimony at the evidentiary hearing regarding Kasler's confession, the State called witness Ken Karnig, a "crime memorabilia" dealer. Karnig claimed Kasler told him in a letter written in May, 2014, four months prior to Kasler's confession to Mr. Brunvand, that he had falsely confessed to having murdered Teri Lynn Matthews. Karnig further claimed to have discussed that letter with Kasler over the phone. The State submitted a copy of that letter into evidence, but presented no evidence to authenticate it as having been written by or sent by Kasler, aside from the testimony of Karnig, who alleged that he had received the letter from Kasler's prison's address and purportedly recognized the handwriting as having been Kasler's. Karnig went on to allege that, in his follow-up conversations with Kasler, Kasler claimed to have falsely confessed to the instant murder because another murder memorabilia dealer, Jeremy Tod Bohannon, had simply asked him to do so. The State presented no recordings from any phone calls that Kasler may have allegedly made between Karnig and/or Bohannon, despite the fact that any such phone calls would have been recorded at the Ohio DOC facility where Kasler was housed.

43. On cross-examination, Karnig first claimed to have never talked to Bohannon about Kasler alleged false confessions. He later claimed, on the other

hand, that Bohannon had told him in 2012 that he was having Kasler write false confessions. Karnig, however, had testified on direct that he had not had contact with Kasler until 2013 and made no mention of having allegedly known of the Bohannon-Kasler false confession conspiracy prior to that time. When pressed for details, Karnig could not say where this conversation with Bohannon took place, nor could he even say whether it took place over the phone or via messaging. Karnig also was not able to say why Bohannon would have allegedly put Kasler up to making false confessions.

44. Karnig went on to testify that he had previously had a relationship with Mr. Bolin many years ago during the pendency of this case. Mr. Bolin ceased contact with Karnig, however, shortly after he met his now-wife. Karnig, more recently, had been prohibited from visiting inmates at Florida's death row as a result of complaints lodged by Mr. and Mrs. Bolin. Prior to that time, Karnig testified that he regularly visited two inmates on death row in the course of his work as a "murder memorabilia" dealer. Though Karnig claimed that being barred from death row did not hurt his business, he conceded that he was not happy with Mrs. Bolin about having gotten him precluded from visiting inmates on death row.

45. The state circuit court denied relief on the Kasler newly discovered claim, reasoning that the Kasler confession would not change the outcome of the case if admitted at a retrial.

17

## Kasler-Related *Brady* Error

46.   On or about November 20, 2014, after Kasler committed suicide, the State Attorney's Office provided Mr. Bolin's counsel with documents it had received from the FDLE which contained correspondence from Stephen Crane to the FDLE and Attorney General's Office from sometime in 2013.   In those letters, Crane informed the State that Kasler had confessed to having committed the murder of "the Matthews girl" in Florida.   The package of documents received from Crane also included several letters authored by Kasler himself detailing the past unsolved or falsely solved murders he had committed.   The State had never previously provided those documents to Mr. Bolin prior to that time, nor had the State otherwise informed Mr. Bolin of the Kasler confession on its own accord.

47.   While the packet of documents at issue was relatively large and somewhat convoluted, it unquestionably stated that Steven Kasler had confessed to the having killed the "Matthews girl" in Florida.   Under the circumstances, the timing of Kasler's suicide substantially prejudiced Mr. Bolin's ability to develop the newly discovered evidence claim regarding the Kasler confession.   But for the State's failure to provide the Crane letters to Mr. Bolin or to otherwise alert Mr. Bolin of the fact that Kasler had confessed to having committed the Matthews murder, Mr. Bolin could have raised the Kasler newly discovered evidence issue as early as 2013.   The state circuit court initially had scheduled an evidentiary hearing

on Mr. Bolin's original Kasler claim to be held approximately three months after the initial motion had been filed. Kasler's suicide, of course, derailed the scheduling of the evidentiary hearing. Given that timeline, however, it stands to reason that, had Mr. Bolin been aware of the Kasler confession in 2013 and correspondingly been able to file the Kasler claim shortly thereafter, the state circuit court would have seemingly scheduled an evidentiary hearing to be conducted no later than the spring of 2014. As such, Kasler would have still been alive and Mr. Bolin, in turn, could have presented Kasler himself as a witness at an evidentiary hearing. Given the State's failure to disclose the Crane-Kasler information after receiving in in 2013, Mr. Bolin has not lost that opportunity forever.

48. As discussed above, Mr. Bolin asserted a *Brady* claim arising from the State's failure to timely disclose the Crane-Kasler communications. The state circuit court denied that claim following the evidentiary hearing.

49. The Florida Supreme Court ruled that Petitioner's *Brady* claim arising from Kasler's confession could not succeed because he failed to establish that the State suppressed of any material evidence arising from the confession. That ruling involved both an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d)(2), and an unreasonable application of the clearly established law of *Brady* within the meaning of § 2254(d)(1).

19

### The State Court's Unreasonable Determination of Facts: § 2254(d)(2)

50. The state court's factual determination that no material evidence relating to Kasler's confession was suppressed was unreasonable under § 2254(d)(2). *See Brumfeld v. Cain*, 135 S. Ct. 2269 (2015) (holding that the state court unreasonably determined facts under § 2254(d)(2) in rejecting a petitioner's claim based on lack of supporting facts for the claim when, in fact, the record contained sufficient supporting facts). Petitioner established both that evidence relating to Kasler's confession was material and that it was suppressed by the State.

51. The materiality prong of *Brady*, also known as the prejudice prong, is met where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Here, the fact of materiality was established by Petitioner.

52. Mr. Bolin established in his state court proceedings that if he is retried in this case, Kasler's confession will be admissible as a statement against penal interest despite Kasler's suicide. The state circuit court agreed that Kasler's confession would be admissible as a matter of law.

53. With Kasler's confession admitted into evidence, the jury will have reasonable doubt as to Mr. Bolin's guilt and will likely render a verdict of not guilty in a retrial. The evidence the State presented against Mr. Bolin rested

largely on the testimony of family witnesses who had motivation to fabricate testimony, including Mr. Bolin's ex-wife, who had both personal and financial incentives to fabricate her testimony. The one purported eyewitness against Mr. Bolin was his half-brother, who repeatedly recanted his allegations against Mr. Bolin over the many years that have passed since the homicide occurred. The half-brother's credibility was, moreover, highly in question during the prior trials. The physical evidence presented against Mr. Bolin was, furthermore, limited and of questionable reliability. The DNA evidence submitted against him established only a partial profile match and merely showed that Mr. Bolin "*could* have been the source of the semen found in a stain on [the victim's] pants." *Bolin v. State*, 869 So. 2d 1196, 1199 (Fla. 2004). Likewise, the population geneticist who testified in Mr. Bolin's trial opined that Mr. Bolin was 2100 times more likely to be the source of the semen than a random, unrelated person. *Id.* While 2100 times more likely may seem to be rather conclusive to a layperson, that frequency is not particularly high for purposes of a DNA match. What's more, any such forensic evidence was likely handled by former FBI agent Michael Malone. For the reasons set forth the subsections to follow, the reliability of any forensic testing performed on evidence Malone handled is now highly suspect. Under the totality of the circumstances, the evidence against Mr. Bolin was far from "overwhelming." The admission of evidence of a detailed confession from a

convicted murderer such as Kasler would certainly leave a jury with reasonable doubt as to Mr. Bolin's purported guilt.

54. The fact of the Kasler confession's materiality is further established by the state court's own prior opinions in Petitioner's case. Mr. Bolin was tried three times for the same murder, with no substantial difference in the body of evidence presented by the State at each trial. *See Bolin*, 650 So. 2d 19; *Bolin*, 736 So. 2d 1160; *Bolin*, 869 So. 2d 1196. Following the first two trials, the Florida Supreme Court reversed his conviction, refusing to find evidentiary and jury selection issues harmless. *See Bolin*, 650 So. 2d 19; *Bolin*, 736 So. 2d 1160. The state court has acknowledged, then, that the quantum of proof was not overwhelming. It was unreasonable, therefore, for the state court to make a factual finding that suppression of a credible confession from another person could not satisfy *Brady*'s materiality prong.

<u>The State Court's Unreasonable Application of *Brady*: § 2254(d)(1)</u>

55. The state court's legal determination that no material evidence arising from Kasler's confession was suppressed by the State was also an unreasonable application of *Brady* for purposes of § 2254(d)(1). *See Williams v. Taylor*, 529 U.S. 362, 413 (2000) (explaining that a state court decision fails the unreasonable application prong of § 2254(d)(1) if the state court identifies the correct governing

legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case).

56. The State's failure to timely disclose the Crane-Kasler letters resulted in a material violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The State's failure to disclose the letters in question satisfied all three prongs of the *Brady* test.

57. First, the evidence was certainly favorable to Mr. Bolin because it discussed another person having confessed to the murder for which Mr. Bolin was convicted. Indeed, it is hard to imagine a more favorable piece of evidence.

58. As to the second prong of the *Brady* test, the State clearly withheld the letters in question. Whether the suppression of those reports was willful or inadvertent, the fact remains that the State did not disclose those reports until the year after receiving them and only after Kasler killed himself. Moreover, while this State Attorney's Office may not have had copies of those letters as early as 2013, agents of the State, *i.e.*, the Attorney General's Office and/or the FDLE, did.

59. Turning to the third prong of the *Brady* analysis, the letters in question were material. As Mr. Bolin established in the preceding section, the admission of evidence of Kasler's confession would likely result in a not guilty verdict if Mr. Bolin were retried in this case. The letters from Crane were the first piece of evidence any of the parties received documenting the Kasler confession. Had Mr. Bolin been aware of those letters within a reasonable time after the State received

them, he could have initiated his newly discovered evidence claim in time to take actual testimony from Kasler. Because, however, the State failed to disclose those letters, Mr. Bolin can never take Kasler's testimony and must now rely on hearsay admitted as statements against penal interest.

60.   Based on the foregoing, the State's willful or inadvertent failure to disclose the Crane-Kasler letters constituted a *Brady* violation that deprived Mr. Bolin of his right to due process as guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution. The state courts, in turn, erred as a matter of law in denying Mr. Bolin relief on this issue. In doing so, the state courts misapplied clearly established federal constitutional law.

### B. The State Failed to Disclose that Former FBI Agent Michael Malone Compromised Critical Evidence in Petitioner's Case

61.   As the Kasler confession evidence was surfacing, Mr. Bolin's counsel was also discovering new evidence indicating that former FBI Agent Michael Malone likely mishandled and compromised critical serological evidence in Mr. Bolin's case. Michael Malone was a hair and fiber analyst with the FBI in the late 1980s and early 1990s during the investigation of the Matthews homicide. Malone's primary significance to the State in the instant case was to link the scene

of the Matthews homicide to the scene of another homicide Mr. Bolin was alleged to have committed – the Stephanie Collins case. When the instant case proceeded to the trial at bar, the State was precluded from presenting evidence of the Collins case. Malone's purported fiber match between the two scenes was not, therefore, admitted into evidence because it did not independently link to Mr. Bolin in any way. Nevertheless, while Malone was a hair and fibers analyst, the State submitted essentially all of the physical evidence that was collected in this case directly to Malone. Malone also apparently prepared at least some, and perhaps all, of the physical evidence that would undergo serological and DNA testing. Malone also conducted hair comparisons of hairs found at the scenes of several cases in which Mr. Bolin was a purported suspect, including the instant case and the Stephanie Collins case. In conducting those analyses, Malone studied known hair samples from Mr. Bolin. In regards to the instant case, Malone compared those samples to two hairs that were collected from the victim's hand in the instant case. Tellingly, those hairs did not match Mr. Bolin. Moreover, one of those two hairs was of a mixed racial profile, which clearly would not have originated from Mr. Bolin.

62. The crux of two Michael Malone related issues began to surface on January 14, 2014 when the U.S. Department of Justice contacted the undersigned by email and forwarded a correspondence that it had sent to predecessor counsel on September 27, 2013. The email stated as follows:

25

By email dated January 14, 2014 (attached), this Office notified you and attached our correspondence of 9-27-13 with your predecessor as defense counsel in this case, Mr. Norgard, in which we notified him of the 1997 report of the Department of Justice Inspector General that identified the work of 13 FBI Laboratory examiners whose work may have failed to meet professional standards. We would like to further inform you that in 1999, the prosecutor advised the 1996 FBI Laboratory Task Force that Malone's work had not been material to the verdict in either the Matthews case, the Collins case, or the Holley case. As a result, the analysis conducted by Malone was not later the subject of an Independent Scientific Review. Please do not hesitate to contact me if you have further questions. Please confirm your receipt of this email.

Attached to the correspondence sent to predecessor counsel were several FBI reports prepared in the course of its work in the instant case. Those reports indicated that Malone handled essentially of the physical evidence that had been sent to the FBI and to Cellmark laboratories in the course of the instant case.

63. Later, on July 30, 2014, the U.S. Department of Justice again contacted counsel regarding the Malone matter in an email that stated:

By letter to previous defense counsel dated September 27, 2013 and email to you dated January 14, 2014 (attached), this Office notified defendant Oscar Ray Bolin of the 1997 Office of the Inspector General (OIG) Report that identified 13 criticized FBI Laboratory examiners whose work may have failed to meet professional standards. In particular, we believe that FBI Laboratory Examiner Michael Malone performed laboratory work for the government in this case. As you are aware, in 1996, following allegations of improper practices by certain FBI Laboratory examiners, the United States Department of Justice established a Task Force to ensure that no defendant's right to a fair trial was jeopardized by the questioned performance of a criticized FBI Laboratory examiner. Beginning in 2012, OIG undertook a review of the work of the 1996 FBI Laboratory Task Force, evaluating its effectiveness in ensuring that

26

defendants potentially affected by faulty FBI Lab analysis or testimony were notified of the Lab deficiencies identified by OIG in their 1997 Report on the subject. In July 2014, OIG issued its findings in a report entitled, "An Assessment of the 1996 Department Task Force Review of the FBI Laboratory" (Assessment). The Assessment can be found online at http://www.justice.gov/oig/reports/2014/e1404.pdf. Because the Assessment addresses the work of FBI Laboratory Examiner Malone in greater detail, we want to bring that report to your attention as well.

Additionally, one of the cases highlighted in Chapter Four of the Assessment is *United States v. Donald Gates*, a 1982 case prosecuted out of the District of Columbia in which Malone testified. It has come to our attention that in January 2014, Malone's deposition was taken in *Donald Gates v. District of Columbia*, Civil Action No. 1:2011-CV-00040, a civil matter related to the *Gates* prosecution.

64.  The July 2014 report from the Office of the Inspector General ("OIG"), as reference in the above email, is a comprehensive138 page report.  The report devotes an entire chapter to "The Forensic Analysis and Testimony by Michael Malone." The OIG summarized the subject of the 2014 Report as follows:

This is the third review by the Office of the Inspector General (OIG) since 1997 related to alleged irregularities by the Federal Bureau of Investigation (FBI) Laboratory (Lab). The first two OIG reports focused on alleged FBI Lab deficiencies, the conduct of individuals brought to our attention by a whistleblower, and remedial actions the FBI took in response to our recommendations. This report addresses how the Criminal Division Task Force (Task Force), created by the Department in 1996 and whose mission was redefined in 1997, managed the identification, review, and follow-up of cases involving the use of scientifically unsupportable analysis and overstated testimony by FBI Lab examiners in criminal prosecutions. We analyzed the Task Force's review of cases involving 13 FBI

examiners the Task Force determined had been criticized in the 1997 OIG report. We included in our review a close examination of cases handled by 1 of the 13 examiners, Michael Malone, the Lab's Hairs and Fibers Unit examiner whose conduct was particularly problematic.

65.   The OIG generally summarized its findings with regards to former agent Michael Malone as:

> Second, we concluded that the Department should have directed the Task Force to review all cases involving Michael Malone, the FBI Lab examiner whose misconduct was identified in the OIG's 1997 report and who was known by the Task Force as early as 1999 to be consistently problematic. Malone's faulty analysis and scientifically unsupportable testimony contributed to the conviction of an innocent defendant (Gates), who was exonerated 27 years later, and the reversal of at least five other defendants' convictions because of Malone's unreliable analysis and testimony. Malone retired from the FBI in 1999, but we learned, and the FBI confirmed, in May 2014 that Malone had been performing background investigations as an active contract employee of the FBI since 2002. After we brought Malone's contract employment to the attention of the FBI and the Department, the FBI reported that, effective June 17, 2014, Malone's association with the FBI was terminated.

It went on to find, with regards to prior investigations into examiners to include Malone, "[i]n our view, the Department fell short of the Task Force's articulated mission to ensure that defendants' rights were not jeopardized by the conduct of any of the 13 examiners when it excluded categories of cases from the Task Force's review."

66.    Later, in its chapter dedicated to Malone, the Report noted "We determined that the independent scientists deemed approximately 96 percent of the Malone cases to be problematic in one or more areas..." It went on to find "The scientists concluded in 94 percent (47 of 50) of the cases that either the appropriate forensic tests were not conducted or it was impossible to determine whether Malone conducted the appropriate tests." The Report also found, "in the same percentage of cases, the scientists concluded that the results Malone described in his lab reports were not supported by his bench notes."

67.    Dr. Frederic Whitehurst, a former FBI forensic analyst who became known as a whistleblower and the catalyst for Inspector General investigations that spanned more than 20 years, later testified regarding the Malone issues and the 2014 OIG Report in a separate state case against Mr. Bolin. At that hearing, Dr. Whitehurst testified at length to his history with the FBI, his more than 20-year investigation into Michael Malone and the affect that Malone's work has had on criminal cases. As to the 2014 OIG Report, Dr. Whitehurst testified to the parallel findings reached by his own investigation and by the OIG in the 2014 Report. He summarized those findings as: "the DOJ agrees that Michael Malone committed some very egregious acts, which makes anything that he did suspect, and which makes evidence that he had in hand suspect."

68.   Given his background and expertise, and pursuant to the investigation that he had conducted into Malone for the preceding two decades, Dr. Whitehurst opined that any testing conducted by Malone is not reliable and has no credibility at the current time.   Likewise, Dr. Whitehurst testified that independent testing or review of Malone's work is insufficient to render the result of any testing reliable because the problem would still remain that Malone had handled the evidence that was the subject of the subsequent testing.   As Dr. Whitehurst testified, with regard to any evidence that Malone touched, "[f]urther analysis doesn't matter... it's useless."

69.   In researching the Malone matter, counsel learned, as documented in the attached OIG report, the Department of Justice and the FBI had been aware of improprieties on the part of Michael Malone long before the instant case went to trial.   Furthermore, in as early as March 11, 1998, the DOJ informed the State of its investigation into Malone and the fact that Malone had performed work in Mr. Bolin's case.   Then, in 1999, the State wrote a letter to the DOJ stating that "...Malone's testimony will not be a factor if a conviction is obtained on retrial." Based on that reasoning, the State further informed the DOJ that it would not be completing a case review form that the DOJ had requested of the State in this case. Similarly, as set forth above, the January 2014 email from the DOJ to counsel regarding the Malone matter stated, in relevant part: "We would like to further

inform you that in 1999, the prosecutor advised the 1996 FBI Laboratory Task Force that Malone's work had not been material to the verdict in either the Matthews case, the Collins case, or the Holley case."

70. Despite having known of the investigation of Malone, the State did not disclose to Mr. Bolin evidence of the ongoing DOJ investigation against Malone, evidence of the fact that Malone apparently handled the evidence that was submitted for serological testing, or evidence of the communications between the DOJ and the State. Given the foregoing, Mr. Bolin also asserted alongside his Malone newly discovered evidence claim, a *Brady v. Maryland*, 373 U.S. 83 (1963), based on the State's failure to disclose available evidence concerning the Malone matter and the communications that it had had with the DOJ.

71. The state circuit court denied relief on the Malone newly-discovered evidence claim and *Brady* claim without conducting an evidentiary hearing.

72. The Florida Supreme Court ruled that Petitioner's *Brady* claim arising from Malone's misconduct could not succeed because he failed to establish that the State suppressed of any material evidence relating to Malone. That ruling involved both an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d)(2), and an unreasonable application of the clearly established law of *Brady* within the meaning of § 2254(d)(1).

## The State Court's Unreasonable Determination of Facts: § 2254(d)(2)

73. The state court's factual determination that no material evidence relating to Malone's misconduct was suppressed was unreasonable under § 2254(d)(2). *See Brumfeld*, 135 S. Ct. at 2269 (holding that the state court unreasonably determined facts under § 2254(d)(2) in rejecting a petitioner's claim based on lack of supporting facts for the claim when, in fact, the record contained sufficient supporting facts). Petitioner established both that evidence relating to Malone's misconduct was material and that it was suppressed by the State.

74. The materiality prong of *Brady*, also known as the prejudice prong, is met where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Kyles*, 514 U.S. at 433. Here, the fact of materiality was established by Petitioner.

75. Given the scant level of evidence presented against Mr. Bolin, coupled with the magnitude and extent of Malone prior bad acts, the newly discovered evidence at issue weakens the State's case to such an extent that it gives rise to a reasonable doubt as to Mr. Bolin's culpability. Mr. Bolin established in the state circuit court that, were an evidentiary hearing conducted in the instant case, Dr. Whitehurst would similarly testify that any evidence handled by Malone is unreliable, has no credibility and, ultimately, is useless. Just as he had done in the Collins case, Dr. Whitehurst could establish, through review of FBI testing reports,

that Malone was the lead examiner in the cases against Mr. Bolin and either tested or handled all evidence that would be forensically tested and used against Mr. Bolin. Furthermore, as set forth above, Dr. Whitehurst testified that the 2014 OIG Report reached conclusions consistent with his own and which the earlier DOJ/OIG investigations had not reached. More importantly, the 2014 Report directly criticized the prior DOJ/OIG investigations into Malone that would have been in existence during the prior trial in this case.

76. As set forth above, the State's evidence against Mr. Bolin was very far from being overwhelming. The physical evidence, furthermore, was a major segment of the State's case. Had the relevant findings of the 2014 OIG Report and the testimony of Dr. Whitehurst been available to Mr. Bolin at trial, the jury would have had reasonable doubt as to the accuracy and reliability of the scientific testing that was performed in this case. In light of the scant other evidence that the State presented, there exists a reasonable probability that the result of Mr. Bolin's trial would have been different had the 2014 OIG report been available at the time of trial. What's more, if a retrial were conducted in this case, the Malone-related evidence would be admitted alongside the newly discovered Kasler confession. To the extent there remains any doubt as to impact of this newly discovered evidence, it a retrial were conducted with the Malone and Kasler evidence admitted, a jury

would almost surely acquit Mr. Bolin in light of the evidence that the State would present.

### The State Court's Unreasonable Application of *Brady*: § 2254(d)(1)

77.   The state court's legal determination that no material evidence arising from Malone's misconduct was suppressed by the State was also an unreasonable application of *Brady* for purposes of § 2254(d)(1). *See Williams v. Taylor*, 529 U.S. 362, 413 (2000) (explaining that a state court decision fails the unreasonable application prong of § 2254(d)(1) if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case).

78.   The 2014 OIG Report and the testimony of Dr. Whitehurst confirmed the fact that, in the years prior to 2002 or 2003, the DOJ's Brady Task Force set out to contact all prosecutors in cases in which Malone had performed work in order to determine if Malone's analyses had been material to specific defendants' convictions.   Likewise, as Mr. Bolin set out in his motion to vacate, the January 2014 email he received from the DOJ to counsel regarding the Malone matter stated that the DOJ had contacted the State in 1999.   In response, the State surmised to the DOJ that Malone's work had not been material to the verdict in *any* of Mr. Bolin's three cases. Despite the fact that the State clearly had knowledge of the ongoing investigation of Malone, the State did not disclose to Mr. Bolin a)

evidence of the ongoing DOJ investigation against Malone, b) evidence of the fact that Malone apparently handled the evidence that was submitted for forensic testing, or c) evidence of the communications between the DOJ and the State. However, as the 2014 OIG Report clearly demonstrates, the allegations of misconduct against Malone involved scores of negligent and intentional acts of misconduct that brought about the presentation of false evidence and led to false convictions in numerous criminal cases. Likewise, the suspected acts of misconduct were seemingly known to the State, or at least to its agents, many years before it was ever revealed to Mr. Bolin.

79. Compounding on the *Brady* standard discussed above, the State's failure to disclose the letters in question satisfied all three prongs of the *Brady* test.

80. First, the evidence was certainly favorable to Mr. Bolin because it called into question the reliability of all of the forensic testing performed in this case.

81. As to the second prong of the *Brady* test, the State clearly withheld the DOJ communications in question. The suppression of those reports would appear to have been willful, but, at the very least, would have been inadvertent.

82. Turning to the third prong of the *Brady* analysis, the DOJ communications were material. While the 2014 Report and its findings were not available at the time of the prior trial, the fact that the DOJ had contacted the State in an investigation of Malone long after the issuance of the 1997 report was a

Case 8:15-cv-02943-JDW-MAP   Document 1   Filed 12/28/15   Page 38 of 44 PageID 38

material fact that could have reasonably changed the outcome of Mr. Bolin's trial, direct appeal, or initial post-conviction proceedings. Had Mr. Bolin been aware of and been able to present evidence to show that the OIG and DOJ were still questioning Malone's work in the years surrounding Mr. Bolin's trial, he could have demonstrated the unreliability of any evidence that Malone handled during his tenure with the FBI, including all of the forensically tested evidence that was admitted at the instant trial.

83. Based on the foregoing, the State's willful or inadvertent failure to disclose the DOJ communications regarding Malone constituted a *Brady* violation that deprived Mr. Bolin of his right to due process as guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution.

**CLAIM II. PETITIONER IS ENTITLED TO RAISE AND SHOULD BE GRANTED RELIEF ON A FREESTANDING ACTUAL INNOCENCE CLAIM ON FEDERAL HABEAS REVIEW.**

84. All other facts, allegations, and claims set forth in this petition, its attachments, and the other submissions made in this litigation are incorporated as if fully set forth herein. This claim was presented to the state court in Petitioner's most recent Rule 3.851 proceeding.

85. The Supreme Court has indicated that, at least in a capital case, a truly persuasive showing of actual innocence, even if not linked to a constitutional claim—i.e., a "freestanding" innocence claim—may warrant federal habeas relief.

*See Herrera v. Collins*, 506 U.S. 390, 417 (1993); *see also House v. Bell*, 547 U.S. 518, 555 (2006) (declining to consider whether a capital defendant could raise a freestanding actual innocence claim because "whatever burden a hypothetical freestanding innocence claim would require, [that] petitioner ha[d] not satisfied it").

86.   The Eleventh Circuit has similarly acknowledged that freestanding innocence claims may be viable in capital cases. *See Johnson v. Warden, Ga. Diagnostic & Classification Prison*, 805 F.3d 1317 (11th Cir. 2015) ("It is not settled whether a freestanding actual innocence claim is viable in a capital case on federal habeas review."); *Jordan v. Sec'y Dep't of Corr.*, 485 F.3d 1351, 1356 (11th Cir. 2007) ("[O]ur precedent forbids granting habeas relief based upon a claim of actual innocence, anyway, at least in non-capital cases.").

87.   Here, Petitioner's newly discovered evidence establishes his actual innocence.  As set forth above, Kasler's confession not only implicates Kasler in the offense, but he completely exonerates Mr. Bolin.  To his knowledge, Kasler and Mr. Bolin have never met or even communicated with one another.  As Kasler stated, Mr. Bolin had nothing whatsoever to do with Ms. Matthew's homicide.  It is hard to imagine a more tangible example of an actual innocence claim than the present scenario in which another perpetrator has confessed to committing the offense at bar.

88. Furthermore, when considered in conjunction with the newly discovered Malone evidence that shows all physical evidence from this case to now be unreliable, Kasler's confession's credibility is amplified. The State's case against Mr. Bolin rested largely on physical evidence, despite the fact none of physical evidence made more than a partial match to Mr. Bolin. The newly discovered Malone evidence now calls into question the accuracy of even those partial matches. Under the circumstances, the Kasler confession and Malone-related newly discovered evidence establishes Mr. Bolin's actual innocence.

89. In addition to the Kasler and Malone evidence, other newly discovered evidence has surfaced in recent years that point to Mr. Bolin's innocence in the other two murder cases alleged against him. The most pertinent of that new evidence is the statement of Terri Ippolitto, the new witness who came forward after the circuit court's October 2015 decision, and stated that she would testify that, on the day before Stephanie Collins[4] was abducted from the parking lot of a Tampa shopping center, a dark-complexioned man tried to lure Ippolitto from the same parking lot. Aside from pointing to Mr. Bolin's innocence in the Collins case, the testimony of Ms. Ippolitto adds additional corroboration to the Kasler confession. Compounding on the corroboration set forth above, Ms. Ippolitto's account now gives credibility to the account of the accomplice Petey having been a

---

[4] The victim in the Thirteenth Judicial Circuit case that is also pending on collateral appeal.

perpetrator who acted with Kasler. Petey may well have been the same person who attempted to abduct Ms. Ippolitto close in time and under circumstances similar to those of the instant case. Ippolitto's account also points to the conclusion that if, in fact, the Matthews, Collins, and Holley cases were all connected, Mr. Bolin was not the perpetrator of those homicides.

90. Aside from the Ippolitto evidence, other new evidence has surfaced that points to Mr. Bolin's innocence in third case alleged against him, the homicide of Natalie Holley. Prior to the most recent Natalie Holley trial two individuals, Steven Witschi and Robert Anton, were discovered and were available to testify that a perpetrator named Edwin Keagle carried out the Holley homicide. Despite the facts that the testimony of Witschi and Anton was not admitted in the Holley case and that evidence of the Holley case was not admitted in the instant case, the Witschi and Anton evidence lends additional corroboration to the Kasler confession, particularly in light of Ms. Ippolitto's account. While Anton and Witschi's testimony does not bear on the Matthews homicide, it does point to Mr. Bolin not having been the perpetrator of the three homicides alleged against him.

## VII.  PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, Petitioner, OSCAR RAY BOLIN, JR., prays that the Court grant him the following relief:

1. That Petitioner be granted a stay of his scheduled January 7, 2016 execution pending the outcome of these proceedings;

2. That Petitioner be granted such discovery as is necessary for full and fair resolution of the claims contained in this Petition;

3. That leave to amend and/or supplement this Petition be granted, as may be appropriate;

4. That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

5. That Petitioner be permitted to file a memorandum of law addressing the legal issues raised by this case, any procedural issues and questions of law related to the federal habeas corpus statute;

6. That Respondent be ordered to respond to Petitioner's claims;

7. That Petitioner be allowed to respond to any affirmative defenses raised by Respondents; and

8. That Petitioner's conviction and death sentence be vacated.

Respectfully submitted,

s/ J. Jervis Wise
J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Ph:   (727) 446-7505
Fax:  (727) 446-8147
Email: jervis@acquitter.com
Florida Bar No. 0019181

s/ Bjorn E. Brunvand
BJORN E. BRUNVAND, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Ph:   (727) 446-7505
Fax:  (727) 446-8147
Email: bjorn@acquitter.com
Florida Bar No. 0831077

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing was furnished by email to the Office of the Attorney General at capapp@myfloridalegal.com and to the Office of the State Attorney at smacks@co.pinellas.fl.us, on this 28th day of December, 2015.

s/ *J. Jervis Wise*
J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Ph:   (727) 446-7505
Fax:  (727) 446-8147
Email: jervis@acquitter.com
Florida Bar No. 0019181
Attorney for Petitioner

s/ *Bjorn E. Brunvand*
BJORN E. BRUNVAND, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Ph:   (727) 446-7505
Fax:  (727) 446-8147
Email: bjorn@acquitter.com
Florida Bar No. 0831077
Attorney for Petitioner

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CASE NO. _____**

**OSCAR RAY BOLIN,**

     **Petitioner,**

v.

**JULIE L. JONES**, Secretary
Florida Department of Corrections

     Respondent.

_____/

**VERIFICATION**

STATE OF FLORIDA )
    BRADFORD ) ss.
COUNTY OF ~~UNION~~ )

    I, Oscar Ray Bolin, verify on this 23 day of December, 2015, the foregoing petition and the facts and allegations stated herein are true and correct.

**FURTHER AFFIANT SAYETH NAUGHT.**

                                   **Oscar Ray Bolin**

**NOTARY PUBLIC**

My Commission Expires:

BRIAN J. PAUL
MY COMMISSION # FF 129579
EXPIRES: June 4, 2018
Bonded Thru Budget Notary Services